IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *v.* | ) | |
| | ) | No. 1:17-cr-270-LMB |
| WAQAR HUSSAIN KHAN, | ) | |
| | ) | |
| *Defendant*. | ) | |

**Government's Opposition To Defendant's
Motion To Dismiss Indictment On Speedy Trial Grounds**

Defendant Waqar Hussain Khan ("Khan") moves this Honorable Court to Dismiss the

Indictment against him on Speedy Trial grounds. For the reasons set forth below, the Court

should deny his motion.  Khan was one of five defendants charged in the pending indictment.

Pakistani authorities arrested Khan and his co-defendants on terrorism charges in December

2009, shortly after they arrived in Pakistan and before they were ever charged in the United

States.  Beginning near the same time, the U.S. government obtained an arrest warrant and IN-

TERPOL Red Notice and repeatedly pressed Pakistani authorities to return them to the United

States for prosecution, including through a formal diplomatic request.  But by June 2010, they

had been convicted in a Pakistani court and sentenced to ten years in prison.  Khan was the first

defendant to be released from prison, and while he now claims to desire a speedy trial, following

his release in Pakistan, he never took any steps to obtain that speedy trial, despite being given

multiple opportunities to do so.  Instead, he found a place to live, got a job and even got married.

During that time the U.S. government repeatedly provided information to Khan through his at-

torney in order to enable him to turn himself in to Pakistani authorities so that he could begin

1

the extradition process. Yet it was not until 2025 that Khan finally availed himself of the information provided by the U.S. government and turned himself in. He was ultimately extradited back to the United States on July 23, 2025, more than a year-and-a-half after his fellow defendant, Umar Farooq Chaudhry, who had initially contested his extradition.

Despite the fact that the defendant waited nearly five years in Pakistan before initiating the extradition process, he now claims the government violated his Sixth Amendment right to a speedy trial. Because the defendant cannot satisfy the test set forth in *Barker v. Wingo*, 407 U.S. 530 (1972), the Court should deny his motion.

## I.    Factual and Procedural Background

The indictment in this case alleges a criminal conspiracy among five young men from the northern Virginia area. Those five defendants, Ahmed Ameer Minni, Ramy Said Zamzam, Aman Hassan Yemer, Umar Farooq Chaudhry, and Waqar Hussain Khan left the United States in two groups on November 28 and November 29, 2009, and flew to Pakistan for the purpose of traveling onward to Afghanistan to attack American and coalition troops. The procedural background in this case, especially as it relates to the efforts made by the U.S. government to gain custody of all five defendants from Pakistan after their arrest, is covered in detail in response to Chaudhry's speedy trial motion in the Government's Opposition to Defendant's Motion to Dismiss Indictment on Speedy Trial Grounds [Dkt. 168 at p.p. 2-11] as well as in this Court's Memorandum Opinion [Dkt. 182 at p.p. 1-8, Hereafter "Memorandum Opinion"]. The government incorporates that information by reference here and will not repeat that lengthy narrative other than to note that its interactions with the Pakistani authorities were always intended to gain custody of all five defendants, to include Khan, as expeditiously as possible.

In its Memorandum Opinion after reviewing the procedural history of this case, the Court concluded that the "uncontested record shows that the government made extensive reasonable efforts to obtain custody of Chaudhry upon his arrest in Pakistan and continued to make numerous requests to the Pakistani authorities for the speedy extradition or deportation of Chaudhry **and his co-defendants**." [Memorandum Opinion at p. 12. Emphasis added].  The Court later found, "Notably, proceeding informally was reasonable given that Article 4 of the United States-Pakistan Extradition Treaty stated that 'extradition shall be deferred until the conclusion of the [defendant's] trial and full execution of any punishment awarded to him, id. at 9, and that there was no prisoner transfer treaty in place between the United States and Pakistan, id. at 10.'" [Memorandum Opinion at p.p. 12-13].  It went on to add that, "[t]he facts in the public record are more than sufficient to establish the government's diligence in seeking the speedy return of Chaudhry to the United States. Moreover, the classified materials reviewed ex parte further corroborate this conclusion. See, Dkt. No. 169]." [Memorandum Opinion at p. 13, fn 8].  The Court concluded, "In sum, the government's repeated requests to Pakistan to turn over **Chaudhry and his co-defendants** clearly demonstrate reasonable diligence, even in the absence of a formal extradition request before 2020." [Memorandum Opinion at p. 13.  Emphasis added].

**a.  Government Efforts to get Khan to Turn Himself in in 2022-2023.**

As the Court confirmed, the government made diligent efforts to bring Khan back to the United States from 2009-2020 while he was serving his Pakistani prison sentence.  And after his release in 2020, the government continued to press for his extradition.  In fact, even before his release from Pakistani prison, the FBI communicated with Khan's family here in the United States in an effort to hasten his return to the United States.  In September 2019, the FBI met with Khan's parents and his brother.  During that meeting, the Khan family told the FBI that they wanted him

to return to the U.S. voluntarily, face the charges and go through the court process. They said they would encourage him to do so. The FBI also assured the Khan family that they would assist all five defendants in getting passports to travel home. [Attachment A, FBI 302 at p. 2].

Two months later, in November 2019, the FBI again visited the Khan family in the United States. Khan's father told the FBI in that meeting that he was planning to travel to meet with Khan to convince him to return to the United States. [Attachment B, FBI 302 at p. 2]. So at least as of late-2019, Khan's family was eager to have him return to this country to face the charges, and was prepared to encourage him to turn himself in. But Khan did not take any steps to return to the United States until years after his 2020 release from Pakistani prison.

Subsequently, in June 2021, the government communicated with Khan's attorney about facilitating his return to the United States. [Exhibit A to Defense Motion to Dismiss, Dkt. 214-1 at p. 2]. In the course of this email, the government stressed that it was seeking to bring all five defendants back to the United States at the same time. The government went on to advise that when the Pakistanis confirmed that the defendants were approved for removal, "your client would then have to immediately consent to extradition and surrender to the Pakistani authorities to be taken into custody." Id. The government stressed that it was "only willing to begin the process if your client fully and promptly commits that he wants our help in returning to the United States." Id. In conclusion, the government advised that we "will continue to press for his arrest and extradition from Pakistan." Id. There is no indication in the record that Khan consented to extradition or attempted to surrender to Pakistani authorities in either 2021 or most of 2022.

However, in December 2022, defense counsel contacted the government and indicated that Khan was "very interested in turning himself in for extradition." [Attachment C at p. 3]. While the government was in the process of communicating with the Pakistani government, defense

counsel reached out again on February 10, 2023, to ask, "Any answers to those questions? He is ready to move forward."  [Attachment C at p. 2].

On May 25, 2023, the government emailed Khan's attorney a 4-page memorandum from a Pakistani attorney outlining the extradition proceedings against Khan and Chaudhry.  In its email, the government advised that based upon the memorandum, Khan could "turn himself in, and if he does so, his case could in theory proceed in tandem with Chaudhry's."  Id.

The memorandum from Pakistan provided details about the extradition process there, but it also indicated that the "extradition inquiry with respect to Khan has not yet commenced since Khan has neither been arrested nor yet surrendered himself."  [Attachment D at p. 3].  However, the memorandum provided two different avenues for Khan to surrender himself, either by appearing "before the FIA [Federal Investigative Agency], which will execute the warrant of arrest, detain Khan and then produce him before the ADC(G) [Additional Deputy Commissioner (General) Islamabad]," or he could "appear directly before the ADC(G),  who will pass appropriate orders for his detention."  Id. at p. 5.  The memorandum concluded "if Khan appears and surrenders himself before the conclusion of the inquiry proceedings against Chaudhry, and concedes his extradition, his case may proceed in parallel with Chaudhry's case and it may be possible to have both of them return together to the United States."  Id.  While Chaudhry ultimately returned to the United States in early December 2023, [Dkt. 159], Khan remained in Pakistan, having seemingly declined to turn himself in to face extradition.[1]

---

[1]  While it appears that Khan chose not to turn himself in to the authorities in Pakistan so that he could be extradited to the United States along with Chaudhry in 2023, the U.S. government had done everything it could to facilitate his return.  But given that he was a citizen of a foreign country, the decision was ultimately Khan's.

**b. Government Efforts to get Khan to Turn Himself in between 2023 and 2024.**

On July 18, 2023, the government contacted Khan's attorney to advise that Chaudhry had agreed not to contest his extradition and to be returned to the United States. [Attachment E at p.p. 4-5]. The government also indicated that the strong preference was to have Khan and Chaudhry return to the United States "on the same flight if at all possible." Id. at p. 5. Defense counsel responded that same day, "Will send this to his family immediately." Id. at p. 4. Nonetheless, when Chaudhry was ultimately flown to the United States in December 2023, Khan remained in Pakistan. There is no indication in the record that he took any steps to return to the United States in 2023.

Subsequently, on August 24, 2024[2], defense counsel re-contacted the government to advise, "Mr. Khan is interested in turning himself in. He is asking that I provide a contact person to coordinate with." Id. at p. 3. Two days later, counsel advised in response to a question from the government that Khan was located in Karachi, Pakistan. Id. The following day the government provided the defense with the POC that they had asked for. The government gave him the location of an FIA office to turn himself into in Islamabad, Pakistan, as well as the name of the Assistant Director for FIA whom he should ask for. Id. at p. 2. Nonetheless, Khan did not turn himself into the FIA in Islamabad, and he remained in Pakistan for the rest of 2024.

**c. Government Efforts to get Khan to Turn Himself in in 2025.**

On February 25, 2025, Khan's attorney contacted the government again to say that "I have just been advised by Mr. Khan that he is ready to turn himself in at the beginning of March. He is asking for instructions. Are you able to assist?" [Attachment F at p. 3]. The government responded

---

[2] August 24, 2024, was exactly ten days after Chaudhry's criminal case had been resolved with a plea of guilty and a sentence of no jail time followed by 20 years of supervised release. Dkt. 190. The government advised the defense of this fact on August 14, 2024. Att. E at p.p. 3-4.

on March 10 and 11, by providing the address of the same FIA Zonal office that they had provided in August 2024 along with the name and contact information of a different Inspector with FIA. Id. at p. 2.

On April 29, 2025, the government was advised that Khan had turned himself in to the FIA Zonal Office in Islamabad, and it advised defense counsel of that in an email. [Attachment G]. On May 1, 2025, Khan's attorney forwarded an email from Khan's brother in which he reported that Khan was now in Pakistani custody. [Attachment H at p. 2-3]. In the course of that email, Khan's brother confirmed that Waqar Khan was the first of the five defendants to be released from prison in Pakistan in 2020. He also described what his brother had been doing since his release ("he started working. Never committed a crime. He even got married"). Yet nowhere in this email did Khan's brother claim that Khan had tried to turn himself in to face these charges until April 2025. Ultimately Khan was extradited back to the United States, arriving on July 23, 2025, five years after his release from Pakistani prison. Dkt. 207.

## II.    The Defendant has not Satisfied the Four-Part *Barker* Test

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy public trial ...." U.S. CONST. amend. VI. The Sixth Amendment right to a speedy trial does not attach until the defendant has been indicted or arrested. *See Doggett v. United States*, 505 U.S. 647, 655 (1992). Based on a plain reading of the Amendment, the Sixth Amendment right to speedy trial "attaches only when a formal criminal charge is instituted, and a criminal prosecution begins." *United States v. MacDonald*, 456 U.S. 1, 6 (1982).

The defendant asserts that his Sixth Amendment rights attached when the government charged him by complaint in 2009. [Def. Mot. 5]. So conceived, the defendant permits himself to argue that there has been an 11-year delay in bringing him to trial, by calculating the

7

timeframe from the filing of the criminal complaint in 2009 to the government's first extradition request in 2020, [Def. Mot. 5], notwithstanding the fact that a grand jury only indicted him in 2017. But it is well established that "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *United States v. Marion*, 404 U.S. 307, 320 (1971). That is why "the Sixth Amendment right to a speedy trial right does not attach until indictment or arrest." *United States v. Uribe-Rios*, 558 F.3d 347, 359 n.8 (4th Cir. 2009) (citing *Jones v. Angelone*, 94 F.3d 900, 906 n.6 (4th Cir. 1996)); *see also Doggett*, 505 U.S. 647 (calculating delay between indictment and arrest). Likewise, an arrest or indictment by one sovereign does not trigger the speedy trial guarantee of the Sixth Amendment with relation to subsequent indictments by another sovereign. *See MacDonald*, 456 U.S. at 10 n.11.

Thus, it is irrelevant that the defendant was arrested on Pakistani charges in 2009, or that there was a U.S. arrest warrant and Red Notice pending. The defendant was not indicted until 2017, and his prior detention flowed from Pakistani charges not the instant charges. *See United States v. Loud Hawk*, 474 U.S. 302, 310 (1986) ("The Court has found that when no indictment is outstanding, only the '*actual* restraints imposed by arrest and holding to answer a criminal charge ... engage the particular protections of the speedy trial provision of the Sixth Amendment.'" (quoting *Marion*, 404 U.S. at 320)). In fact, the defendant's Sixth Amendment right attached when he was indicted in 2017. But even assuming the defendant's Sixth Amendment right attached in 2009, it would not aid his cause. If the defendant's Sixth Amendment right attached in 2009, then he only first asserted that right in 2025. This fact, as explained below, weighs heavily against the defendant. Moreover, irrespective of whether the defendant's Sixth

Amendment speedy trial clock began in 2009 or 2017, he cannot satisfy the test set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

In assessing a Sixth Amendment speedy trial claim, the defendant must demonstrate that the following four factors weigh in his favor: (1) the length of the delay; (2) the government's justification for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Id.*

### A. The Length of the Delay

"The length of the delay is both the [*Barker*] balancing test's first factor and a threshold requirement because the defendant must establish that the length of the delay is at least presumptively prejudicial to trigger the balancing inquiry." *United States v. Villa*, 70 F.4th 704, 713 (4th Cir. 2023) (internal quotation marks and citation omitted). Here, the length of the delay is enough to trigger further inquiry under *Barker*. But even though the defendant "has satisfied the threshold requirement, that fact by no means ends [the] *Barker* inquiry." *Woolfolk*, 399 F.3d at 598. This is because "[a] criminal defendant cannot win a Sixth Amendment challenge by pointing to a calendar and counting off the days. He instead must show that, by balancing the four factors the Supreme Court has instructed us to consider in speedy-trial cases, he should receive relief." *Martinez v. United States*, 828 F.3d 451, 458 (6th Cir. 2016). The Supreme Court has repeatedly explained that "presumptive prejudice [from a lengthy delay] cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria." *Doggett*, 505 U.S. 655-66; *see also id.* at 652 n.1 ("'[P]resumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the [four-factor] enquiry."). Because the remaining *Barker* factors weigh in the government's favor, the length of the delay is insufficient to merit dismissal. *See United States v. Hills*, 618

9

F.3d 619, 632 (7th Cir. 2010) ("[A]s long as the government shows reasonable diligence in prosecuting its case, a defendant who cannot demonstrate prejudice with specificity will not show a Sixth Amendment violation, no matter how long the delay.").

### B. The Government's Justification for the Delay

#### 1. Delay caused by the Defendant's Conviction in Pakistan.

The delay caused by the defendant's conviction in Pakistan was extensively addressed in the government's Opposition to Chaudhry's Motion to Dismiss as well as in this Court's Memorandum Opinion denying Chaudhry's Motion, and those portions are incorporated by reference herein. [*See,* Government's Opposition to Defendant's Motion to Dismiss on Speedy Trial Grounds at p.p. 14-25; *See also*, Memorandum Opinion at p.p. 10-14]. In sum, the government argued, and the Court concluded, that the government's repeated requests to the government of Pakistan to obtain custody of Khan and his co-defendants throughout their detention, demonstrated reasonable diligence even in the absence of a formal extradition request prior to 2020. [Memorandum Opinion at p. 13].

#### 2. Defendant's Delay in Seeking to be Extradited from Pakistan.

The defendant was the first of the five defendants to be released from prison in 2020. As previously noted, the defendant's family had expressed to the FBI as early as 2019 that they were eager to see him return to the United States, and they would encourage him to do so. In June 2021, the government told Khan's attorney that it would assist in his return to the U.S. but only "if your client fully and promptly commits that he wants our help to return to the United States." [Exhibit A to Defense Motion to Dismiss, Dkt. 214-1 at p. 2]. There is no indication in the record that the defendant ever provided such assurances.

In fact, far from acting promptly, the defendant waited until December 2022 before contacting his attorney (through his brother) to indicate that he wanted to turn himself in for extradition. [Att. C at p. 3]. Notably, Khan's brother asked detailed questions about Umar Chaudhry's[3] extradition hearing in Pakistan which was then ongoing. Id. So clearly Khan and his family knew and were following the progress of that extradition. If there were ever a time to move promptly to ensure that he could be extradited from Pakistan at the same time as Chaudhry, that was the time.

In response to that email, the government provided Khan's attorney with a memorandum from an attorney in Pakistan on May 25, 2023, that outlined the extradition process, and what Khan would need to do to initiate it. In sum, Khan was given two options for how he could go about turning himself in. [Att. D at p. 5]. By this point Khan had been out of prison for nearly three years. It was readily apparent that the Pakistanis were not going to arrest him on the extradition, so if he truly wanted a speedy trial, it was incumbent upon him to turn himself in to the Pakistani authorities to start that process.

Yet he refused to turn himself in in 2023 or 2024, even though there were intermittent communications between the government and defense counsel about having him do exactly that. The second time that Khan expressed a desire to be extradited through his attorney was on August 24, 2024, ten days after the government had advised that Chaudhry's case had been concluded with a no jail sentence. It seems likely that Khan was waiting to see how Chaudhry's case was going to be resolved before agreeing to come back to the United States. If that is so, it certainly does not suggest that this is a defendant who was eager for a speedy trial. Yet in either regard,

---

[3] Khan's brother referred to "Omar's" extradition hearing, but from the context of the email, it is clear that he is referring to "Umar" [Chaudhry].

he did not return to the United States then, despite the fact that the government had provided detailed instructions on where to turn himself in.

Ultimately, when the defendant finally turned himself in to Pakistani authorities on April 29, 2025, he did so by going to the precise FIA Zonal Office in Islamabad that the government had identified as the appropriate place to turn himself in. [Att. F at p. 2; Att. G at p. 2].[4] This was six years after his family had said they would encourage him to turn himself in. It was four years after the government had told his attorney that he needed to fully commit to being extradited. And it was nearly two years since the government had given him detailed instructions on where to go to turn himself in.

It goes without saying that the U.S. government had no authority in Pakistan to arrest the defendant. And the Pakistani authorities were plainly not going to arrest him, they were simply going to allow him to turn himself in. So, any delay in this extradition, if any is to be found, is entirely attributable to the defendant. Had he truly wanted a speedy trial, he would have turned himself in to the Pakistani authorities at the first opportunity. Instead, he made a conscious decision to turn himself in at a time of his own choosing. He did not act expeditiously to try to obtain a speedy trial, so he cannot now claim a speedy trial violation. Therefore, the reason for the delay weighs against him.

### C. The Defendant's Assertion of the Right

The third *Barker* factor also weighs against the defendant. As discussed above, the defendant made no effort to assert his speedy trial right because he did not want a speedy trial.

---

[4] Even then he waited nearly a month-and-a-half to turn himself in, from March 10, 2025, until April 29, 2025. Att. F at p. 2; Att. G at p. 2.

Instead, he elected to wait until a time of his own choosing to finally turn himself into the Pakistani authorities.  By the time he turned himself in, he was a married man with a job living openly in Pakistan where he was a citizen.

If, as the defendant claims, his Sixth Amendment right attached in 2009, then his failure to assert his purported right until 2025 is significant. And if his speedy trial right attached in 2017, then he still waited eight years to assert that right. And of course, after his release from prions in 2020, the defendant failed to promptly turn himself in to Pakistani authorities as instructed so that the extradition process could begin.  "How then can he argue with a straight face that the failure of the United States to extradite him entitles him to dismissal of the charges?" *In re Kashamu*, 769 F.3d at 494; *see also United States v. Tranakos*, 911 F.2d 1422, 1429 (10th Cir. 1990) ("We are unimpressed by a defendant who moves for dismissal on speedy trial grounds when his other conduct indicates a contrary desire."). However calculated, the defendant's assertion of his speedy trial right is tardy. Moreover, his recent assertion of the right is undermined by his conduct in waiting for years before ultimately agreeing to return to the U.S. to face the instant charges. This factor therefore weighs against the defendant under *Barker. See Robinson*, 55 F.4th at 400; *Grimmond*, 137 F.3d at 829; *United States v. Quinteros*, 769 F.2d 968, 974 (4th Cir. 1985).

### D. Prejudice to the Defendant

The final *Barker* factor also weighs against the defendant. The defendant's motion addresses prejudice in only the vaguest of terms [Def. Mot. 6-7].  Prejudice "should be assessed in the light of the interests the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532. These include: (1) preventing oppressive pretrial incarceration, (2) minimizing the anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired. *See Smith*, 393 U.S. at 378. However, "[p]roof of prejudice must be definite and not speculative.

Courts apply the actual prejudice test stringently." *Manning*, 56 F.3d at 1194.

The first item listed by the defendant, lost opportunity for concurrent sentencing while incarcerated abroad [Def. Mot. 6] is too speculative to succeed. *See United States v. Lozano*, 962 F.3d 773, 781 (4th Cir. 2020) (rejecting similar argument); *Uribe-Rios*, 558 F.3d at 358. The defendant fails to support the proposition that he could have served a concurrent sentence in the U.S. on Pakistani charges or explain how, or on what authority, such a sentence would have been structured. Furthermore, the Pakistani authorities' insistence on prosecuting the defendant and ensuring the completion of his sentence belies the notion that such a result could have occurred.

The second and third listed harms, oppressive confinement in Pakistan and anxiety and stigma from unresolved charges during years of imprisonment were entirely out of the U.S. government's control until approximately July 23, 2025, when the defendant was transferred to FBI custody after finally agreeing to be extradited. *See United States v. Hall*, 551 F.3d 257, 272–73 (4th Cir. 2009) ("The Defendants contend that, when awaiting trial, they were subjected to an oppressive four-year pretrial incarceration, plus eighteen months of pretrial house arrest during the Maryland proceedings. Of significance, their incarceration occurred during the time of their prosecution in the District of Columbia."). During his incarceration in Pakistan, the U.S. government asked for the defendant to be deported through a formal diplomatic note, filed a Red Notice seeking his custody, and maintained regular contacts with the defendant through consular visits. The U.S. government also stayed in contact with their Pakistani counterparts for purposes of providing regular updates to Judge O'Grady. Yet the Pakistanis insisted on holding all five defendants until their sentences were completed in full, and, unlike the other three defendants, would not release the defendant after his sentence was completed absent a formal extradition

14

request. Nonetheless, as soon as the defendant arrived in the U.S., the government did not oppose his pretrial release, so there can be no argument that the government contributed to any sort of oppressive pretrial incarceration, or that it contributed to the anxiety and concern of the accused.

The defense also claims that even if the defendant receives the same sentence as his co-conspirators, time served and 20 years supervised release, that will still be prejudicial. [Def. Mot. 7]. Yet this Court already determined in Chaudhry's Motion to Dismiss that there was no prejudice in a sentence of time served with 20 years supervised release. [Memorandum Opinion at p. 16]. The same rationale applies to Khan who was released on bond at his first appearance, in a case carrying very serious charges.

That leaves the final interest identified in *Barker*, the possibility that the defense will be impaired. Of the three defense interests identified in *Barker*, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532. Here, the defendant makes only the most general assertion of prejudice flowing from purported memory loss [Def. Mot. 7]. But the defendant fails to identify a single individual whose memory might have been affected by the passage of time. This is plainly insufficient to satisfy his burden under *Barker*. *See Hall*, 551 F.3d 257, 272–73 (rejecting prejudice argument where "Defendants are unable to point to any evidence that their defense was impaired by the delay. Indeed, they have not identified any witnesses that were unavailable as a result of the delay; they have not shown that any witness was unable to accurately recall the relevant events; they do not contend that exculpatory evidence was lost; nor have they identified any evidence that was rendered unavailable by the delay."); *United States v. Hopkins*, 310 F.3d 145, 150 (4th Cir. 2002); (same); *Grimmond*, 137 F.3d at 830. Not only is "such a generalized

claim of memory problems [] not sufficient for a defendant to show the required specific preju-

dice to his defense, *Cabral*, 979 F.3d at 165 (cleaned up), but "delay is a two-edged sword[5]. It

is the government that bears the burden of proving its case beyond a reasonable doubt. The

passage of time may make it difficult or impossible for the government to carry this burden[.]"

*Loud Hawk*, 474 U.S. at 315.

Moreover, the defendant's theory of memory loss is inconsistent with the facts of this case

and the government's anticipated evidence. The defendants in this case were so secretive in plan-

ning these crimes that they made it certain that there would be few, if any, witnesses. The defend-

ant cannot point to any evidence that has been lost or is unavailable given the passage of time.

The defense was promptly provided with thousands of pages of discovery in this case, which

includes the defendants' online communications, their travel plans, efforts to obtain money for

these trips, and voluminous search warrant returns. This material also includes an FBI 302 detail-

ing the defendant's admission that his goal was to wage jihad in Afghanistan, and that he under-

stood that if they pursued this path that the defendant might end up fighting against American

soldiers.  In short, there is a wealth of inculpatory evidence in this case, and defendant fails to

point to any exculpatory evidence that has been lost due to the passage of time.

Again, this is not surprising given the level of secrecy that went into these offenses.

Simply put, there is no one who could assist in his defense, because the defendants were so suc-

cessful in keeping their plans secret from any potential witnesses. The only people with inside

knowledge of this conspiracy were the five defendants. Three of those defendants, Minni, Zam-

zam, and Chaudhry, have now pleaded guilty to providing material support to a foreign terrorist

---

[5] The defendant can point to no witnesses that can be characterized as "lost."  And significantly, the three witnesses who likely know the most about this case, Minni, Zamzam and Chaudhry, are all residing in this district, and they are all equally available to the prosecution and the defense.

organization.  They have signed robust statements of fact admitting to their own conduct, as well as the conduct of the defendant. To the extent they would have any testimony to offer in this case, it would be helpful to the government, not to the defendant.

Because the defendant's attempt to show prejudice is vague, conclusory, and entirely speculative, the final *Barker* factor weighs against him. Moreover, as the Fourth Circuit recently held, the defendant's inability to show prejudice undercuts the significance of the other interests he asserts under *Barker*'s fourth prong. *See United States v. Pair*, 84 F.4th 577, 590–591 (4th Cir. 2023); *see also Barker*, 407 U.S. at 534 (finding "absence of serious prejudice" although defendant was incarcerated for ten months before trial and was forced to "liv[e] for over four years under a cloud of suspicion and anxiety" because "there [was] no claim that any of Barker's witnesses died or otherwise became unavailable owing to the delay.").

### Conclusion

"To prevail on a speedy trial claim, a defendant must establish that on balance, [the] four separate factors weigh in his favor." *Id.* at 589. Because the second, third, and fourth *Barker* factors weigh against the defendant, he cannot satisfy his burden of showing a Sixth Amendment speedy trial violation. The Court should therefore deny the defendant's motion to dismiss.

Respectfully submitted,

Erik S. Siebert
United States Attorney


By:     <u>  /s/   John T. Gibbs        </u>
           John T. Gibbs
           Assistant United States Attorney
           United States Attorney's Office for the
           Eastern District of Virginia
           2100 Jamieson Avenue
           Alexandria, Virginia 22314
           703-299-3700

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2025, I electronically filed the foregoing Opposition to Defendants' Motion to Dismiss Indictment for Violation of the Speedy Trial Act with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

Respectfully submitted,

    /s/   John T. Gibbs
        John T. Gibbs
        Assistant United States Attorney
        United States Attorney's Office for the
        Eastern District of Virginia
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        703-299-3700