**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

────────────

**No. 24-4471**

────────────

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

  v.

UMAR FAROOQ CHAUDHRY,

                Defendant - Appellant.

────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:17-cr-00270-LMB-4)

────────────

Argued:  September 11, 2025             Decided:  December 16, 2025

────────────

Before KING, WYNN, and QUATTLEBAUM, Circuit Judges.

────────────

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge King and Judge Wynn joined.

────────────

**ARGUED:**  Geremy C. Kamens, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Joseph Attias, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Erik S. Siebert, United States Attorney, John T. Gibbs, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

────────────

QUATTLEBAUM, Circuit Judge:

Umar Farooq Chaudhry traveled from the United States to Pakistan with hopes of joining in *jihad* in Afghanistan. But after arriving in Pakistan, Chaudhry was arrested, tried and convicted by Pakistani authorities of terrorism-related offenses. He then spent the next decade in a Pakistani prison. After his release, he was extradited to the United States to face similar charges. Chaudhry moved to dismiss the indictment, arguing that the United States violated his Sixth Amendment speedy trial rights by not seeking his extradition earlier. The district court rejected that argument. While Chaudhry then pled guilty, the terms of his conditional plea allowed him to challenge the district court's speedy trial determination in this appeal. Because we find no Sixth Amendment violation, we affirm his conviction.

## I. BACKGROUND

### A. Chaudhry Travels to Pakistan

Chaudhry was born in Pakistan in 1985 but moved to the United States with his family when he was six years old. He is now a dual citizen of both the United States and Pakistan. In 2009, he and four others—Ahmed Ameer Minni, Aman Hassan Yemer, Waqar Hussain Khan and Ramy Said Zamzam[1]—intended to travel to Afghanistan to wage violent *jihad* in opposition to U.S. and U.S.-allied forces.

---

[1] At times, authorities referred to the group as the "Sargodha Five," based on the town in which they were ultimately arrested. But, since they later became criminal co-defendants in the district court, we refer to them as "defendants." Minni, Yemer, Khan and Zamzam are not parties to this appeal.

2

The defendants' plan originated when an individual called "Saifullah" (which translates to "Sword of Allah") recruited Minni and Yemer over YouTube. J.A. 255. Minni and Yemer then recruited the rest of the defendants and, with guidance from Saifullah, developed a scheme to travel to Pakistan, with the hope of then crossing into Afghanistan.

Before they left the United States, the defendants created an 11-minute "final message" video. J.A. 259. The video was in both English and Arabic and depicted graphics, text, footage of U.S. soldiers in Iraq and photos of civilian casualties over background music. While these images played, Zamzam narrated,

> when Muslim lands are invaded, when Muslim children are terrorized, when Muslim women are raped, when our brothers and sisters are attacked and killed, . . . *jihad* becomes, by the consensus of the scholars . . . , an individual obligation . . . to defend his brothers and sisters and give them victory.

J.A. 259 (alterations in original). Zamzam showed the video to the other defendants at a computer shop owned by Chaudhry's family in Lorton, Virginia. The defendants saved the video to a USB drive and gave it to another individual with the intent that the video eventually be uploaded to YouTube.

After four months of planning, the defendants departed for Pakistan in November 2009. Once they arrived, Minni attempted to arrange a meeting with Saifullah but had difficulty contacting him. As a result, the defendants took it upon themselves to find their own way into Afghanistan. Khan and Chaudhry turned to a mosque in Hyderabad, Pakistan that they knew to be associated with *Jaish-e-Mohammed*, a designated foreign terrorist organization. Eventually, they met the emir of the mosque, who instructed them to go to Lahore, Pakistan, where there was a headquarters for a camp of *mujahideen*. The next day,

the defendants traveled to the location given to them by the emir. This turned out to be a mosque associated with *Jamaat-ud-Dawa*, a different Islamic organization. A *Jamaat-ud-Dawa* representative explained that the defendants would need a reference before they could be accepted. So, the defendants then journeyed to Sargodha, another city in Pakistan, where they hoped one of Chaudhry's relatives could supply the necessary endorsement.

Back in Virginia, the defendants' families informed the Federal Bureau of Investigation that the defendants were missing and handed the FBI the USB drive containing the final message video. On December 9, 2009, after the defendants reached Sargodha, Pakistani authorities arrested them in a house belonging to Chaudhry's cousin. At the time of their arrest, the defendants possessed handwritten notes referencing the Hyderabad mosque, *Jamaat-ud-Dawa* and the initials "JeM"—which is short for *Jaish-e-Mohammed*.

The FBI interviewed Chaudhry two days after his arrest while he was being detained by law enforcement in Pakistan. He stated, "[W]e came for the sake of Islam to work with the Muslims. . . . I am letting you know that I know about the video. We came here together and the video speaks for us. Whatever the video says, I am for that." Schwindt Aff. ¶ 19, *United States v. Chaudhry*, No. 1:17-cr-00270-LMB-4 (E.D. Va. judgment entered Aug. 14, 2024), ECF 2. That same day, the FBI's Legal Attaché informed Pakistan's Minister of Interior that the United States intended to bring charges against the defendants. But extraditing the defendants from Pakistan to the United States to face those charges would prove difficult.

**B. The Extradition Process**

Before describing the events leading to Chaudhry's extradition, we discuss the extradition process generally and the history of extradition of criminal defendants to the United States from Pakistan. Extradition is an official process of one country surrendering an alleged criminal in response to a demand made by the executive of another country with jurisdiction over the crime charged. *See Extradition*, BLACK'S LAW DICTIONARY (12th ed. 2024). Unlike other, less formal methods of seeking the return of the alleged criminal from another country, extradition requires a treaty. *See Factor v. Laubenheimer*, 290 U.S. 276, 287 (1933). Thus, the nature and extent of a country's right to extradition is dependent upon the treaty that created it. *Id.*

The relevant treaty here is that signed by the United States and the United Kingdom back in 1931. *See* Extradition Treaty, U.K.-U.S., Dec. 22, 1931, T.S. No. 849. In 1942, the United Kingdom extended the treaty to cover its colonial holdings in India, which includes modern-day Pakistan. James J. Saulino, Article, *Strategic Choices: Four Legal Models for Counterterrorism in Pakistan*, 2 HARV. NAT'L SEC. J. 247, 261 (2011). When Pakistan gained independence in 1947, it agreed to remain bound by the treaty, and the treaty continues to govern the extradition rights between the United States and Pakistan today. *See id.*; U.S. DEP'T OF STATE, TREATIES IN FORCE: A LIST OF TREATIES AND OTHER INTERNATIONAL AGREEMENTS OF THE UNITED STATES IN FORCE ON JANUARY 1, 2020, at 345 (2020), https://www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf [https://perma.cc/S76S-7EKX].

Notably, Article Four of the Extradition Treaty prohibits extradition of an alleged criminal who is already facing trial or a prison sentence in Pakistan:

> The extradition shall not take place if the person claimed has already been tried and discharged or punished, or is still under trial in the territories of the High Contracting Party applied to, for the crime or offence for which his extradition is demanded.

> If the person claimed should be under examination or under punishment in the territories of the High Contracting Party applied to for any other crime or offence, his extradition shall be deferred until the conclusion of the trial and the full execution of any punishment awarded to him.

Extradition Treaty, art. IV.

To implement the treaty, Pakistan follows a lengthy formal extradition process. Jeffrey Olson, then Associate Director of the United States Justice Department's Office of International Affairs (OIA), submitted a declaration in support of the government's opposition to Chaudhry's motion to dismiss the indictment. He explained that the process begins when a country routes an extradition request through the Pakistani Ministry of Foreign Affairs to the Pakistani Ministry of Interior. The Ministry of Interior then forwards the request to a magistrate, who reviews to determine whether the request complies with Pakistani law and the applicable extradition treaty. If these requirements are met, the Ministry of Interior advances the request to the cabinet of Pakistan's federal government, which ultimately decides whether or not to grant the request. A fugitive can also challenge these proceedings by seeking judicial review in Pakistan's courts and, if initially unsuccessful, can seek appellate review and even petition the Pakistani Supreme Court.

Olson also explained that the United States has been down this road before with little success. In recent years, the United States has directed many such requests at Pakistan,

but Pakistan has often either lost or destroyed those documents. As a result, the United States' requests have been met with significant delays or, worse yet, silence. Even under the best of circumstances, the process can take years, and Pakistan has been reluctant to communicate with the United States on the status of its requests. Indeed, despite the numerous requests, the United States has successfully extradited only two prisoners from Pakistan, other than Chaudhry, in the last fifteen years: one in 2015 and one in 2021.

Still, while the formal extradition process has proven difficult, Olson added that Pakistan has, at times, been willing to informally "deport" foreign nationals. J.A. 154. Like the formal extradition process, deportation requires the approval of various Pakistani government officials, but the deportation process can be faster than extradition. Thus, because Chaudhry is an American citizen, the United States hoped and believed Pakistan might consent to deporting him rather than requiring the formal extradition process.

### C. Initial Efforts Seeking Chaudhry's Return

Turning back to the defendants' situation, on December 15, 2009—just a few days after the defendants' arrest—the United States' Assistant Legal Attaché in Pakistan met with the Director General of Pakistan's National Crisis Management Center within the Ministry of Interior. During the meeting, the Assistant Legal Attaché informed the Director General that the United States was planning to charge the defendants and would seek their return from Pakistan to the United States to do so. In response, the Director General explained that, because the defendants had received a consular visit,[2] Pakistan considered

---

[2] There are notes in the record reflecting various consular visits in which officials from the United States Embassy checked in on Chaudhry's health and wellbeing at various

their detention to be "formal" and would "want the [United States] to follow the formal extradition process." J.A. 114. But, when the Assistant Legal Attaché then asked whether Pakistan would be willing to deport the defendants because they were United States citizens, the Director General "advised that this was possible but harder now that the intelligence agencies were involved." J.A. 114. The Director General "further advised that it may take a bit of time to arrange for their extradition/deportation/repatriation, and as such the [United States] should initiate a formal request soon." J.A. 114. He explained that any decision on whether to "deport/repatriate" would be a political decision made by the district police. J.A. 114. And he "advised that if the [United States] wished to smooth the process of transferring the five to US custody, [the Ambassador] should discuss this matter directly with [the Pakistani Minister of Interior] and immediately following this discussion, the [United States] should issue its formal request." J.A. 114–15.

On December 23, 2009, a special agent of the FBI filed a criminal complaint against Chaudhry and the other defendants in the United States District Court for the Eastern District of Virginia, accusing them of conspiring to provide material support to terrorists. The district court issued an arrest warrant later that same day.[3] The following day, the United States moved for the district court to unseal the criminal complaint so that the

---

points during his imprisonment in Pakistan. The only notes in the record are from visits between 2017 and 2019. But there does not appear to be any dispute that Chaudhry received consular visits throughout his imprisonment in Pakistan.

[3] This arrest warrant does not appear in either the joint appendix or the district court's docket. But there does not seem to be any dispute that the district court issued an arrest warrant the day it issued its criminal complaint, as the issuance of the arrest warrant was mentioned in the government's motion to unseal, which it filed the next day.

Justice Department could seek a Red Notice for the defendants from the International Criminal Police Organization.[4]

That same day—December 24, 2009—the Legal Attaché notified the Pakistani Ministry of Interior of the charges pending against the defendants in the district court and provided the Ministry of Interior with copies of the defendants' arrest warrants. The Legal Attaché also stated that the United States government was seeking custody of the defendants so that they could stand trial. She explained that her office could facilitate the transfer of the defendants by air transport from Pakistan to the United States within 72 hours. That same day, Pakistan informed the Legal Attaché that its local court had ordered that the defendants must be detained and could not be transferred to a foreign government.

On December 28, 2009, the Legal Attaché stated that a formal extradition request from the United States "may carry more weight than simply providing the arrest warrants." J.A. 157. Consequently, OIA worked with the United States Attorney's Office for the Eastern District of Virginia and the United States Department of State to craft an official request for Pakistan to return the defendants to the United States for prosecution. The

---

[4] A Red Notice is a request for international law enforcement to arrest an individual pending extradition. *Guan v. Barr*, 925 F.3d 1022, 1029 n.2 (9th Cir. 2019). In essence, INTERPOL member countries can request that INTERPOL's General Secretariat issue a Red Notice when there is a national arrest warrant out for an individual. *Id.* Thus, "[a]lthough a Red Notice is not an international arrest warrant, it is the closest instrument to an international arrest warrant in use today." *Id.* (citations and internal quotation marks omitted).

United States Embassy in Islamabad presented this request—drafted as a diplomatic note—to Pakistan's Ministry of Foreign Affairs.[5]

In the diplomatic note, the United States first acknowledged that all five defendants are United States citizens and that Chaudhry is a dual United States-Pakistani citizen. After explaining the charges pending against the defendants in the United States, the United States recognized that Pakistan was also preparing to charge the defendants. However, the note stated, "the United States believes that the transfer of the defendants now rather than at the conclusion of any proceedings in Pakistan would serve both our Governments' interests in this matter and in combating terrorism more broadly." J.A. 409. It went on to state that, "[w]ere the transfer of the defendants delayed pending lengthy proceedings in Pakistan, or even their service of a sentence of imprisonment in Pakistan, the United States' case may be weakened, and we may lose opportunities to identify and disrupt terrorist networks operating in the United States." J.A. 409. The note concluded by requesting that Pakistan "consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." J.A. 410. There is no record of the United States receiving a response to this note.

Over the next several months, the Legal Attaché worked with Pakistani officials to gather more information on Pakistan's prosecution and investigation of the defendants. In early June 2010, the United States' Ambassador to Pakistan met with the Pakistani Minister

---

[5] The diplomatic note was first presented to Pakistan on January 8, 2010. Because of a typographical error, the note was later amended and presented again on January 15, 2010. In this opinion, we refer to the note as it read on January 15, 2010.

of Interior to reiterate the United States' position that the defendants should be returned. Then, on June 23, 2010, the Legal Attaché sent a letter to Pakistan's Interior Secretary in which the Legal Attaché similarly memorialized his position that the defendants should be transferred to the custody of the United States.

On June 24, 2010, the defendants were convicted in a Pakistani court of conspiring to commit terrorist acts in Pakistan. Each received a ten-year prison sentence. While the defendants served their sentences over the next decade, the Legal Attaché periodically checked in with Pakistani officials on the defendants' status and with officials in the Eastern District of Virginia on the status of the United States' pending case against the defendants. For example, in a March 4, 2013 letter to the Director General of Pakistan's Federal Investigation Agency, the Legal Attaché requested a meeting to discuss, among other things, the United States' "pending requests for extradition" of certain individuals in Pakistan, including the defendants. J.A. 169. The defendants' Red Notices also remained in effect during this time.

### D. Chaudhry's Extradition to the United States

On November 16, 2017, a federal grand jury in the Eastern District of Virginia indicted the defendants on four counts related to their attempted *jihad*.[6] The district court issued new arrest warrants for the defendants that same day.

---

[6] Specifically, the grand jury charged the defendants in Count I with conspiracy to provide material support to terrorists, in Count II with attempting to provide material support to terrorists, in Count III with conspiracy to provide material support to a designated foreign terrorist organization and in Count IV with attempting to provide material support to a designated foreign terrorist organization.

11

In December 2019, Olson learned that Pakistan intended to release the defendants on or around January 3, 2020. Shortly after learning this information, OIA requested that the State Department and the United States Embassy in Islamabad confirm with the Pakistani Ministry of Foreign Affairs that the defendants' sentences would soon expire so that the United States "could proceed with extradition or deportation." J.A. 159. In response, OIA learned from the Ministry of Interior that Chaudhry was actually scheduled to be released on March 29, 2020.[7]

On June 22, 2020, the Pakistani Ministry of Foreign Affairs sent the United States Embassy in Islamabad a diplomatic note stating that Pakistan would not consent to Chaudhry's deportation and would, instead, require a formal extradition request. OIA then assisted the United States Attorney's Office with preparing the extradition request. After some COVID-19 related delays, the United States Embassy in Islamabad presented the Pakistani Ministry of Foreign Affairs with the extradition request on November 12, 2020. But Chaudhry had evidently already been released on June 9, 2020.[8]

For roughly the next year and a half, Chaudhry's extradition request worked its way through the approval process in Pakistan. As this happened, OIA continued to monitor the process and was in regular contact with the Legal Attaché, but there was little new information. After the Pakistani cabinet permitted the extradition request to proceed to

---

[7] Because of outstanding fines, the other four defendants were scheduled to be released on October 3, 2020.

[8] The record does not indicate why Chaudhry was released on June 9, 2020, instead of on March 29, 2020, or why the Pakistani Ministry of Foreign Affairs did not mention his release in the June 22, 2020 note.

judicial review, the request was to advance to the Pakistani Supreme Court. But those proceedings could not begin until after Chaudhry was re-arrested. In May 2022, the Federal Secretary for Pakistan's Ministry of Interior informed the Legal Attaché that there were arrest warrants out for Chaudhry in Pakistan.

On August 17, 2022, Chaudhry was re-arrested in Pakistan. After that, he spent the next several months fighting extradition through several Pakistani court proceedings. Eventually, he relented, and the presiding judge in Pakistan approved his extradition on July 14, 2023—roughly eleven months after his arrest. The Pakistani cabinet then approved Chaudhry's extradition, and he was extradited from Pakistan and landed at Washington Dulles International Airport on December 6, 2023.

### E. Proceedings in the District Court

Chaudhry was arraigned in the district court on December 12, 2023. During the arraignment, the district court asked the parties about scheduling a trial date and noted that it had designated the case as complex. The district court specifically asked Chaudhry whether he wished to insist on a trial within seventy days, as permitted by the Speedy Trial Act. Chaudhry waived that right. After some additional questions, the district court determined that Chaudhry had made a knowing and voluntary waiver, with full advice of his court-appointed counsel, of his rights under the Speedy Trial Act.[9]

On January 11, 2024, Chaudhry moved to dismiss his indictment based on alleged violations of his Sixth Amendment rights to a speedy trial. The district court denied

---

[9] Chaudhry does not contend that there were any violations of the Speedy Trial Act.

Chaudhry's motion from the bench during a hearing on April 4, 2024. And on June 5, 2024, it issued a memorandum opinion to more fully explain its reasoning.

On May 2, 2024, Chaudhry and the government reached a conditional plea agreement pursuant to Federal Rule of Criminal Procedure 11(a)(2). Chaudhry agreed to plead guilty to one count of conspiracy to provide material support and resources to a foreign terrorist organization—*Jaish-e-Mohammed*—in violation of 18 U.S.C. § 2339B. In exchange, the government agreed to recommend a sentence of time served, plus 20 years of supervised release. The parties also agreed that Chaudhry could preserve his right to pursue this appeal of the district court's denial of his motion to dismiss the indictment. After Chaudhry pled guilty, the district court accepted the parties' sentencing recommendation. This appeal followed.[10]

## II. DISCUSSION

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. The Supreme Court has stated that the bounds of this right are "impossible to determine with precision." *Barker v. Wingo*, 407 U.S. 514, 521 (1972). Consequently, it has instructed that "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Id.* at 522. Such an analysis requires balancing four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his rights and (4) prejudice to the defendant. *Id.* at 530. No specific factor is "either a necessary

---

[10] We have jurisdiction over this appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291.

or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id*. at 533. To prevail, a defendant must establish that, on balance, the factors weigh in his favor. *United States v. Hall*, 551 F.3d 257, 271 (4th Cir. 2009).

The district court found that the first factor weighed in Chaudhry's favor but that there was no Sixth Amendment violation because the remaining three factors weighed against him. We review the district court's factual findings on a motion to dismiss an indictment for clear error and its legal conclusions de novo. *United States v. Pair*, 84 F.4th 577, 588 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2589 (2024). Ultimately, we agree with the district court's analysis and affirm Chaudhry's conviction.

## A. Length of Delay

We begin with the length of delay. Length of delay is not only the first *Barker* factor but also a threshold inquiry.[11] *Doggett v. United States*, 505 U.S. 647, 651–52 (1992). That is, before a defendant can advance to the other factors, he must allege that the time between his accusation and trial was "presumptively prejudicial." *Id.* (quoting *Barker*, 407 U.S. at 530–31). The Supreme Court has suggested that, depending on the nature of the charges, a delay becomes presumptively prejudicial for purposes of the first factor when it approaches one year. *See id.* at 651–52 & n.1; *accord Hall*, 551 F.3d at 271. Of course, before we can determine the length of the delay, we must start by identifying the point in time from which

---

[11] We understand this seems a bit inconsistent. How can the length of delay be a threshold "triggering mechanism"—without which a speedy trial claim fails—and one of four factors if none of the factors are "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial"? *Barker*, 407 U.S. at 530, 533. But that is what *Barker* says.

the delay is to be measured—or, in other words, when Chaudhry's speedy trial rights attached. *See United States v. MacDonald*, 456 U.S. 1, 6 (1982); *Hall*, 551 F.3d at 271.

In *MacDonald*, the Supreme Court instructed that a defendant's rights under the Speedy Trial Clause attach once he "is indicted, arrested, or otherwise officially accused." 456 U.S. at 6. Thus, "[a]lthough delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending." *Id.* at 7 (citation omitted). Consequently, a defendant's arrest or indictment is normally the triggering event for a defendant's constitutional rights to a speedy trial. *See, e.g.*, *United States v. Villa*, 70 F.4th 704, 714 (4th Cir. 2023); *Hall*, 551 F.3d at 271; *see also United States v. Uribe-Rios*, 558 F.3d 347, 358 n.8 (4th Cir. 2009). However, in *United States v. Thomas*, 55 F.3d 144, 149 (4th Cir. 1995), and again in *United States v. Woolfolk*, 399 F.3d 590, 597 (4th Cir. 2005), we held that the combination of a federal detainer, arrest warrant and criminal complaint can trigger a defendant's Sixth Amendment speedy trial rights, even before the defendant faces a federal indictment or is in federal custody.

Our holdings in *Thomas* and *Woolfolk* thus raise an interesting question—do we measure the length of delay from Chaudhry's criminal complaint, Red Notice and arrest warrant in 2009, or do we measure that delay from Chaudhry's subsequent indictment in 2017? The district court acknowledged this issue, and the possible tension between our decision in *Thomas* and Supreme Court precedent. But it ultimately determined it was unnecessary to resolve the issue in this case. That's because, according to the district court,

16

the first factor favors Chaudhry whether the length of delay is measured from 2009 or from 2017.

Chaudhry agrees with the district court's assessment that the first factor weighs in his favor. Yet he urges us to look more closely into when his rights were triggered—and ultimately to find that his rights were triggered by his 2009 criminal complaint, Red Notice and arrest warrant. As he points out, the Supreme Court has indicated that the length of delay may be relevant to our determinations on the other factors because the presumption of prejudice attributable to government delay "compounds over time." *Doggett*, 505 U.S. at 657.

We agree with the district court that it is not necessary to resolve this issue here. Instead, we assume, consistent with our decision in *Thomas*, that Chaudhry's rights were triggered with the arrest warrant, Red Notice and criminal complaint in 2009. *See* 55 F.3d at 149. Thus, as the district court determined, the delay far exceeded a year and was, therefore, presumptively prejudicial.[12] *See Doggett*, 505 U.S. at 651–52 & n.1; *Hall*, 551 F.3d at 271. Consequently, the first factor weighs in Chaudhry's favor, and Chaudhry has made the threshold showing necessary to proceed to the remaining three factors. *See Doggett*, 505 U.S. at 651–52 & n.1.

---

[12] For the same reason, the delay would still have been presumptively prejudicial for purposes of this factor even if Chaudhry's rights did not attach until his 2017 indictment. *See Doggett*, 505 U.S. at 651–52 & n.1; *Hall*, 551 F.3d at 271. Consequently, the first factor comes out the same either way. Chaudhry later argues that the specific length of delay is relevant to the analysis of the fourth factor—whether he suffered prejudice. However, under the facts of this case, we find that the prejudice factor weighs against him whether the delay is measured from 2009 or 2017 for reasons we will explain below.

## B. Reason for the Delay

The heart of this case comes down to the second *Barker* factor—the reason for delay. "On this factor, a reviewing court must carefully examine several issues, specifically focusing on the intent of the prosecution." *Hall*, 551 F.3d at 272. We must characterize the reason for delay as either improper, neutral or valid. *Id.* On one end of this spectrum, it is improper for the government to deliberately delay trial to frustrate the defense, and we weigh those delays heavily against the government. *Barker*, 407 U.S. at 531. In the middle, we weigh neutral reasons—which include the government's negligence—against the government but to a lesser degree than improper delays. *Id.* Finally, at the other end of the spectrum, the government may present valid reasons to justify the delay. *Id.* These reasons, if applicable, weigh in the government's favor. *Id.* As already noted, the district court found that the government presented valid reasons for the delay.

The parties disagree on how our standard of review operates when considering this factor. The government argues that we review the district court's conclusions on reasonableness for clear error. In response, Chaudhry argues that the district court's reasonableness determination involves the legal import of undisputed facts, which he contends we must review de novo. But we need not decide that question today because, even if we assume Chaudhry is right, we conclude the government acted reasonably.[13]

---

[13] To emphasize, we do not resolve the standard of review issue in this decision. Even so, a summary of how we have discussed it in the past, as well as related decisions from the Supreme Court and other circuits, may be helpful. At times, we have stated that we review a district court's decision on all four *Baker* factors de novo. *E.g.*, *United States v. Robinson*, 55 F.4th 390, 399 (4th Cir. 2022); *see also Hall*, 551 F.3d at 269–73 (reviewing a defendant's Sixth Amendment speedy trial claim, among other issues, and

Challenging the district court's determination, Chaudhry argues that the government's decade-long delay in requesting his extradition from Pakistan was either deliberate or negligent and should weigh against the government. In essence, he asserts three reasons for this conclusion. First, he argues that Pakistan's prosecution of him is not, by itself, a valid reason for delaying the United States' prosecution because the United States did not make a diligent, good-faith effort to seek his return for trial. While Chaudhry concedes that another sovereign's prosecution is often a valid reason for delay, he points

---

stating, "[w]e review de novo a properly preserved constitutional claim"). At other times, when reviewing a district court's decision on a motion to dismiss an indictment on Sixth Amendment speedy trial grounds, we have reviewed legal conclusions de novo and questions of fact for clear error. *E.g.*, *Pair*, 84 F.4th at 588; *see also Woolfolk*, 399 F.3d at 594, 597–98 (stating that "[w]e review the district court's factual findings on a motion to dismiss an indictment for clear error, but we review its legal conclusion de novo" when reviewing a district court's decision based on the Speedy Trial Act and then applying that same standard of review to its decision on the Sixth Amendment). For its part, the Supreme Court has instructed that, specifically when assessing the government's reasonableness in this Sixth Amendment context, we are to give "considerable deference" to the district court's determinations on negligence. *Doggett*, 505 U.S. at 652. And though we have never taken a position on what this "considerable deference" requires, every one of our sister circuits to have considered the issue have interpreted "considerable deference" as something akin to clear error review. *See United States v. Cabral*, 979 F.3d 150, 163 (2d Cir. 2020) (citing *Doggett*, 505 U.S. at 652, and reviewing the district court's negligence determination for clear error); *United States v. Scully*, 951 F.3d 656, 670 (5th Cir. 2020) (same); *United States v. Villarreal*, 613 F.3d 1344, 1351 n.4 (11th Cir. 2010) ("We have articulated our standard for reviewing a district court's findings about whether the government acted diligently variously as review for 'clear error' and review 'with considerable deference.' Under either articulation of the standard of review, the result in this case would be the same." (citations omitted)); *see also United States v. Heshelman*, 521 F. App'x 501, 512 (6th Cir. 2013) (Clay, J., concurring) ("Considerable deference is not, however, a standard we frequently apply in connection with appellate review, but it would appear that in this context, considerable deference equates to clear error review, which is familiar."); *United States v. Velazquez*, 749 F.3d 161, 187 n.1 (3d Cir. 2014) (Jordan, J., dissenting) ("There is a persuasive argument that the 'considerable deference' standard for the reasonable diligence determination is simply another way of saying 'clearly erroneous review.'").

out that the government did not seek extradition until after he served his sentence. He argues it should have done so at the conclusion of the Pakistani prosecution. He further argues that the Pakistani prosecution was "fraudulent" and "illegitima[te]," which undermines the United States' claim that there was a justifiable excuse for delay. Op. Br. at 24. Second, Chaudhry argues that the United States' repeated requests that Pakistan deport him, rather than extradite him, were futile because of his Pakistani citizenship. Thus, he contends that these efforts do not show that the United States made a good-faith effort in securing his return. Finally, he argues that, despite Article Four of the Extradition Treaty and the Pakistani court order, the United States could have requested extradition prior to the end of his sentence, and its failure to do so means the government did not make diligent, good-faith efforts to return him for trial.

We do not find these arguments persuasive. To explain why, we first address the standard of reasonableness before considering whether the government's actions met that standard.

### 1. Standard of Government Reasonableness

In general, waiting for another sovereign to finish prosecuting a defendant is a valid reason for delay. *United States v. Grimmond*, 137 F.3d 823, 828 (4th Cir. 1998); *see also Thomas*, 55 F.3d at 150 (finding that allowing the defendant to be prosecuted in state court without interference by the federal government was "an obvious additional reason for the delay"). Still, Chaudhry is correct that another sovereign's imprisonment of a defendant is not alone sufficient to justify a delay in bringing the defendant to trial on pending charges. *See Smith v. Hooey*, 393 U.S. 374, 382–83 (1969). Indeed, even in such circumstances, the

government has "a constitutional duty to make a diligent, good-faith effort" to secure the defendant's appearance in court for trial. *Id.* at 383.

While all appear to agree that the government can usually demonstrate that it has met this burden by pursuing formal extradition, a formal extradition request is not required to show diligent, good-faith efforts to secure a defendant's return for trial. *See, e.g.*, *United States v. Diacolios*, 837 F.2d 79, 83 (2d Cir. 1988) ("Indeed, we are aware of no case that holds that a formal request for extradition must be made before due diligence can be found to have existed."); *see also United States v. Walton*, 814 F.2d 376, 379 (7th Cir. 1987) ("No case law holds . . . that a formal request for extradition must be made before due diligence can be found to have existed for purposes of the Speedy Trial Act."). For instance, the government need not pursue formal extradition to demonstrate diligence when such an effort would have been futile. *Diacolios*, 837 F.2d at 83–84. Likewise, the government is not negligent simply because it could have pursued more aggressive means of securing a defendant's return. *See United States v. Valencia-Quintana*, 136 F. App'x 707, 709–10 (5th Cir. 2005). Thus, the government may demonstrate it acted with reasonable diligence in pursuing a defendant's return through other efforts short of a formal extradition request. *See id.*; *see also Walton*, 814 F.2d at 379–80 (finding that the government exercised due diligence for Speedy Trial Act purposes by requesting the defendant's return to the United States through a series of informal exchanges).

### 2. Whether an Extradition Request Would Have Been Futile

Here, the government argues that it believed making a formal extradition request before the completion of Chaudhry's prison sentence would have been futile. The district

court found that determination to be reasonable. We find no error in the district court's conclusion.

Two considerations, in particular, lead us to accept the government's futility argument. First, Article Four of the Extradition Treaty indicates that an "extradition *shall not take place*" if the person subject to the extradition request is currently facing trial for a crime and that "extradition *shall be deferred* until the conclusion of the trial and the full execution of any punishment awarded to him." Extradition Treaty, art. IV (emphasis added). The use of the word "shall" indicates a mandatory, rather than discretionary, prohibition on the extradition of a prisoner before the completion of his sentence. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *cf. United States v. Pomeroy*, 822 F.2d 718, 721–22 & n.7 (8th Cir. 1987).[14] Thus, the plain language of this treaty indicates that Pakistan would not have extradited Chaudhry prior to the completion of his sentence.

---

[14] In *Pomeroy*, the Eighth Circuit determined that the government violated a defendant's speedy trial rights in failing to seek extradition. 822 F.2d at 721–22 & n.7. In contrast to the extradition treaty at issue in this case, the extradition treaty with Canada there used the word "may":

> When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender *may be deferred* until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

*Id.* at 721 n.7 (emphasis added) (citation omitted).

Chaudhry argues that, despite the treaty's apparent mandatory language, Pakistan still could have waived Article Four and extradited him prior to the completion of his sentence. He notes that the United States declined to enforce a similar provision in its extradition treaty with South Africa in *Beukes v. Pizzi*, 888 F. Supp. 465, 469 (E.D.N.Y. 1995). But we disagree that *Beukes* applies here. In *Beukes*, South Africa sought the extradition of an individual who was, at the time, incarcerated by the United States Bureau of Prisons. 888 F. Supp. at 467. The prisoner fought extradition, pointing to a provision in the United States-South Africa extradition treaty, which stated a prisoner's "extradition shall be deferred until . . . the full execution of any punishment awarded to him." *Id.* at 469 (alteration in original) (citation omitted). The court rejected the prisoner's argument and stated that only the United States had standing to enforce this prohibition in its extradition treaty. *Id.* Thus, while the United States declined to enforce a similar provision in an extradition treaty in *Beukes*, the issue there was who had standing to enforce an extradition treaty, not whether the provision in the extradition treaty was mandatory or discretionary. Besides, whether the United States previously declined to enforce such a provision in a treaty with South Africa has no bearing on whether the United States correctly estimated that Pakistan would seek to enforce a similar provision in its treaty with the United States.

Second, the history of the United States' extradition requests to Pakistan also supports the government's futility argument. In nearly every instance the United States made extradition requests to Pakistan in the past, those requests were not timely addressed, were lost or destroyed or were ignored by the Pakistani government. Over the past fifteen years, despite the United States making many requests to Pakistan, only three fugitives

have successfully been extradited from Pakistan, including Chaudhry after he consented to extradition.[15] Additionally, it was especially doubtful that Pakistan would have consented to extradite Chaudhry prior to the expiration of his sentence given that a local court had issued an order prohibiting his transfer to a foreign government, which remained in effect through the expiration of Chaudhry's prison sentence.

Considering this evidence, we find no error in the district court's futility determination.

### 3. Whether the Government Made Reasonably Diligent, Good Faith Efforts

In addition to finding that a formal extradition request likely would have been futile, the district court found that the government made a reasonably diligent, good-faith effort to secure Chaudhry's return to the United States. Once again, we find no error in that determination.

First, the Legal Attaché promptly informed Pakistan that the United States intended to bring charges against Chaudhry just a few days after his arrest. Then, just a few days after that, the Assistant Legal Attaché had a meeting with the Director General of Pakistan's National Crisis Management Center in which the Assistant Legal Attaché requested Pakistan's assistance in ensuring a quick and smooth transfer of Chaudhry to the United States to face charges. It is true that, during that meeting, the Director General

---

[15] During its hearing on Chaudhry's motion, the district court asked if Pakistan had ever previously extradited an individual who was serving a sentence in a Pakistani prison. The government was unaware of that happening but could not say for certain whether either of the previous extraditions from Pakistan mentioned in Olson's declaration involved prisoners serving sentences in Pakistani prisons at the time of extradition.

initially stated that Pakistan wanted the United States to request Chaudhry's formal extradition. However, when the Assistant Legal Attaché asked whether Pakistan would be willing to deport Chaudhry and the other defendants, the Director General expressly stated that deportation "was possible." J.A. 114.

The fact that the Director General overtly indicated Pakistan's potential willingness to deport Chaudhry undermines Chaudhry's position. Chaudhry argues that the government was negligent in believing Pakistan would be willing to deport him rather than extradite him because it would violate international and Pakistani law for Pakistan to deport one of its own citizens. We disagree. We do not fault the United States for believing Pakistan might deport Chaudhry at this point when Pakistani officials stated as much. Chaudhry is effectively arguing that the United States was negligent for believing a foreign government's statements about its interpretation of its own laws. Certainly, there may be instances when the United States should be suspicious of claims made in high-stakes international negotiations and diplomacy. But Chaudhry misinterprets the government's burden. As we have stated, the government is not required to pursue every option available to it to show it acted with reasonable diligence. *See Valencia-Quintana*, 136 F. App'x at 709–10; *see also Walton*, 814 F.2d at 379–80. Thus, despite the Director General stating that Pakistan might prefer for the United States to pursue formal extradition, the United States' determination that deportation was possible, and perhaps even preferable, as of this December 15, 2009 meeting was reasonable.

What's more, the United States continued to make reasonable efforts to secure Chaudhry's return after that. The day after filing the criminal complaint against Chaudhry

in the district court, the United States moved for the court to unseal that criminal complaint so that it could seek a Red Notice. *Cf. United States v. Heshelman*, 521 F. App'x 501, 506, 509–10 (6th Cir. 2013) (finding that the government did not make a diligent, good-faith effort when it failed to seek a Red Notice). Also, that same day, the Legal Attaché informed Pakistani officials about the charges against Chaudhry. She stated that the United States was seeking Pakistan's cooperation in returning Chaudhry to the United States. The United States then formally requested Chaudhry's deportation via the diplomatic note it transmitted through its Embassy in Islamabad in January 2010.

Over the next several months, the United States made numerous efforts to reiterate its concerns to Pakistani officials. Even after Chaudhry was convicted in Pakistan, the Legal Attaché periodically checked in with Pakistani officials for status updates while Chaudhry served his ten-year prison sentence. Finally, when Pakistan did state, for the first time, that it would *require* the United States to pursue formal extradition on June 22, 2022, the United States submitted a formal extradition request on November 12, 2022.

Challenging this evidence, Chaudhry relies on two out-of-circuit decisions— *Pomeroy* and *Heshelman*—that held the government did not put forth reasonably diligent efforts to secure the defendants' return from abroad. But in those cases, the government made virtually no effort, whether through formal extradition or otherwise, to return the defendants to the United States for prosecution. Instead, in *Pomeroy*, the government held the defendant's extradition request "in abeyance" until the completion of his sentence in Canada. 822 F.2d at 719. Similarly, in *Heshelman*, the United States sought neither extradition nor a Red Notice, specifically out of hopes that the defendant would voluntarily

return to the United States. 521 F. App'x at 506, 508–09. In contrast, the government made extensive efforts to repatriate Chaudhry.

Putting all this together, we affirm the district court's determination that the United States made reasonably diligent, good faith efforts to secure Chaudhry's extradition to the United States.

### 4. Chaudhry's Pakistani Conviction

Finally, Chaudhry argues that his conviction in Pakistan was "fraudulent" and "illegitima[te]" and contends that this undermines the government's claim that the Pakistani prosecution was an acceptable reason for delay. Op. Br. at 24. He contends that he was convicted in Pakistan of planning attacks on Pakistani targets and that this conviction was secured using falsified evidence manufactured by the Pakistani government. He argues that it defies logic to justify the delay in seeking extradition based on a "fraudulent" prison sentence when the government cannot produce evidence to support the legitimacy of that sentence. Reply Br. at 10–11. The district court rejected this argument, finding any alleged illegitimacy did not weigh against the government. We agree.

Chaudhry's argument on the alleged illegitimacy of the Pakistani prosecution is confusing. First, the charges Chaudhry was convicted of in Pakistan—conspiring to commit acts of terrorism in Pakistan and providing financial support to a terrorist organization in Pakistan—appear to be similar to those he pled guilty to in the United States. After all, Chaudhry stipulated that he approached *Jaish-e-Mohammed* in Pakistan about his plans to engage in *jihad*, and he pled guilty in the United States to conspiring to

27

provide material support to that organization.[16] If similar charges in Pakistan were, as Chaudhry argues, illegitimate, is he saying the United States' charges were defective as well?

Second, even if Chaudhry were correct that his Pakistani prosecution was illegitimate, we are not sure how this would help him here. If Pakistan went to the trouble of fabricating evidence against Chaudhry to support a conviction, we see no reason why it would then consent to extraditing him prior to the completion of the prison sentence stemming from that conviction. If anything, this would seem to further demonstrate why it would have been futile for the United States to request Chaudhry's extradition prior to the completion of his Pakistani prison sentence.

For these reasons, we agree with the district court that the government neither deliberately delayed Chaudhry's prosecution nor was it negligent in failing to seek Chaudhry's extradition before it did. As such, Chaudhry's prosecution and subsequent prison sentence in Pakistan justify the delay in proceedings against him in the United States, and we agree with the district court's analysis of this factor.

### C. Chaudhry's Assertion of His Rights

The third factor we must consider in assessing Chaudhry's Sixth Amendment challenge is the "timeliness and vigor" of Chaudhry's assertion of his speedy trial rights. *See Hall*, 551 F.3d at 271. In general, "[f]ailure to assert the right to a speedy trial, and

---

[16] We also note that Chaudhry's claim that the Pakistani prosecution was fraudulent is based mostly on news articles describing the charges against him and on speculative statements from his father's declaration.

even the explicit waiver of that right, is not dispositive of a Sixth Amendment speedy-trial claim." *Thomas*, 55 F.3d at 150. Instead, this is one factor we consider based on the circumstances of each individual case. *Barker*, 407 U.S. at 528. While a defendant bears some responsibility in asserting his right to a speedy trial, the government ultimately faces the burden of proving that a defendant's waiver of that right was knowingly and voluntarily made. *Id.* at 528–29.

In assessing this factor, we first consider the period between Chaudhry's 2009 criminal complaint, when we assume Chaudhry's speedy trial rights attached, and his release from Pakistani prison on June 9, 2020. Chaudhry contends that, while imprisoned, he did not know about the charges pending against him in the United States, and the government does not challenge that assertion.[17] We cannot fault Chaudhry for failing to assert his speedy trial rights during this period when he did not know about the charges pending against him. *See Doggett*, 505 U.S. at 653; *see also United States v. Velazquez*, 749 F.3d 161, 182–83 (3d Cir. 2014) ("Although the *Doggett* Court did not explicitly announce that the defendant's awareness of the indictment—rather than knowledge of earlier events, such as an investigation or an arrest warrant—was the critical measuring point, such a rule is consistent with longstanding principles governing a defendant's speedy trial rights.").

The next relevant period is that between Chaudhry's June 9, 2020 release from Pakistani prison and his extradition to the United States on December 6, 2023. While it is

---

[17] Chaudhry apparently did, however, ask if there were pending charges against him in the United States during a February 1, 2018 consular visit.

unclear when Chaudhry first learned of the charges pending against him in the United States, his court-appointed defense counsel in the United States asserted that Chaudhry intended to fight extradition from Pakistan as early as August 17, 2020, not long after he was released from Pakistani prison. The United States presented Pakistan with a formal extradition request on November 12, 2020, but Chaudhry was not re-arrested by Pakistani authorities until August 17, 2022. He then spent roughly the next eleven months fighting extradition in Pakistani courts. Thus, rather than asserting his right to a speedy trial, Chaudhry did exactly the opposite—he sought to delay his return to the United States for trial, possibly with plans to never return. As such, we find that Chaudhry was not diligent in pursuing his speedy trial rights during this period. *See In re Bramson*, 107 F.3d 865 (4th Cir. 1997) (unpublished table decision) (finding that the defendant was responsible for delays in trial when the only reason for delay was the defendant fighting extradition); *United States v. Reumayr*, 530 F. Supp. 2d 1200, 1206 n.6 (D.N.M. 2007) ("Courts have recognized that a defendant resisting extradition, or otherwise avoiding attempts to bring him to this country, is attempting to avoid going to trial at all in the United States. This is the opposite of insisting on a speedy trial.")

And finally, we consider the time after Chaudhry's return to the United States on December 6, 2023. Chaudhry was arraigned on December 12, 2023, and moved to dismiss on Sixth Amendment speedy trial right grounds shortly thereafter on January 11, 2024. From this, Chaudhry argues that he promptly asserted his rights to a speedy trial. Also, while Chaudhry acknowledges that he consented to a single extension of Speedy Trial Act deadlines, he argues that this should not be weighed against him because his Speedy Trial

Act rights are distinct from his rights under the Sixth Amendment. We agree that Chaudhry was relatively prompt in asserting his Sixth Amendment speedy trial rights after his arraignment and that consenting to a continuance on a single occasion does not doom a defendant's speedy trial claim. *Cf. Barker*, 407 U.S. at 534 (finding the defendant had not diligently asserted his right by failing to object to 11 continuances). Chaudhry is also correct that his rights under the Speedy Trial Act and the Sixth Amendment are distinct. *United States v. Gonzalez*, 671 F.2d 441, 442 (11th Cir. 1982). But these rights are also "obviously related." *Id.* Thus, we find that Chaudhry's waiver of his Speedy Trial Act deadline does weigh against him, though not as much as a defendant who fails to object to more than one continuance. *See Barker*, 407 U.S. at 534; *Pair*, 84 F.4th at 590 (weighing the third *Barker* factor against a defendant who initially failed to object to trial continuances).

On balance, while we do not fault Chaudhry for failing to assert his speedy trial rights before learning of the charges against him, his subsequent conduct shows he was not diligent in pursuing his rights. Indeed, Chaudhry tried to avoid trial from the moment he learned of the charges pending against him.[18] For this reason, we see no error in the district court's conclusion that this factor weighs against finding a Sixth Amendment violation.

---

[18] Chaudhry insists that his speedy trial claim is focused only on the period during which he was imprisoned in Pakistan and that his subsequent conduct cannot be used to show he waived a challenge to the government's negligence during that period. We take Chaudhry's point that, had the government been negligent for his decade-long imprisonment, that might outweigh the much shorter period in which he failed to diligently assert his rights. *See Velazquez*, 749 F.3d at 181 n.19 (noting that a long period of government negligence outweighed a shorter period of government diligence for speedy

### D. Prejudice

Finally, we turn to whether Chaudhry was prejudiced. "Prejudice, 'while not . . . essential to the establishment of a violation of the right, is a prime issue and a critical factor.'" *United States v. Lozano*, 962 F.3d 773, 781 (4th Cir. 2020) (quoting *Ricon v. Garrison*, 517 F.2d 628, 634 (4th Cir. 1975)). Courts must assess this factor based on the interests the speedy trial right is designed to protect, including,

> (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

*Barker*, 407 U.S. at 532. Thus, when a witness dies or disappears, prejudice to the defense could be obvious because the defendant could not accurately remember the events. *Id.* "Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." *Id.*

The district court determined that this factor weighed against finding a Sixth Amendment violation because Chaudhry made only vague assertions of harm, which are insufficient to show actual prejudice. Chaudhry argues that this was in error. He contends that we should reverse both because the district court failed to consider that he was presumptively prejudiced and because he made a showing of actual prejudice.

Starting with Chaudhry's argument on presumptive prejudice, the Supreme Court has suggested that long periods of delay caused by the government's negligence may cause

---

trial purposes). But, because the government was reasonably diligent in seeking to bring Chaudhry to trial while he was in a Pakistani prison, we disagree with his conclusion.

a presumption of prejudice and thereby relieve the defendant of needing to make a showing of actual prejudice. *Doggett*, 505 U.S. at 658; *accord United States v. Lloyd*, 645 F. App'x 273, 278 (4th Cir. 2016) ("Negligence over a sufficiently long period can establish a general presumption that the defendant's ability to present a defense is impaired, meaning that a defendant can prevail on his claim despite not having shown specific prejudice." (quoting *Velazquez*, 749 F.3d at 175)). Nevertheless, because the delay in this case was not caused by government negligence, Chaudhry must show actual prejudice to carry his burden on this factor.[19] *See Doggett*, 505 U.S. at 656; *United States v. Erenas-Luna*, 560 F.3d 772, 778–79 (8th Cir. 2009). The district court, therefore, did not err by failing to consider presumptive prejudice.

---

[19] Recall from our discussion of the first factor that when we considered the length of delay, presumptive prejudice meant a delay was sufficiently long to trigger the rest of the *Barker* inquiry. *Doggett*, 505 U.S. at 652 n.1. Some courts have also interpreted the Supreme Court's decision in *Doggett* to mean a defendant can be presumptively prejudiced for purposes of the fourth factor. *See, e.g.*, *United States v. Duran-Gomez*, 984 F.3d 366, 379–80 (5th Cir. 2020); *Velazquez*, 749 F.3d at 184–86; *United States v. Erenas-Luna*, 560 F.3d 772, 778–79 (8th Cir. 2009). But, confusingly, in such cases the term "presumptive prejudice" has a different meaning when analyzing the fourth *Barker* factor than it does when analyzing the first *Barker* factor. *United States v. Muhtorov*, 20 F.4th 558, 653 n.81 (10th Cir. 2021). When analyzing the fourth factor, these courts presume prejudice when they find that the first three *Barker* factors weigh heavily against the government. *E.g.*, *Duran-Gomez*, 984 F.3d at 379.

Thus, the reason Chaudhry is so adamant that we credit his rights as attaching in 2009 instead of 2017 is because he believes it shows a long period during which the government was negligent—meaning he was presumptively prejudiced for purposes of the fourth factor. We are unaware of any reported case in which we have examined whether *Doggett* endorses this sort of burden shifting exercise on the fourth factor. But we need not opine on that today. Even if that is the case, presumptive prejudice, for purposes of the fourth factor, would require a long period of government negligence. *See Doggett*, 505 U.S. at 656; *Erenas-Luna*, 560 F.3d at 778–80. And because we find the government acted reasonably, Chaudhry was not presumptively prejudiced for purposes of this factor, making it unnecessary for us to further examine the specific length of delay.

Chaudhry next argues that he suffered actual prejudice for three reasons. First, he contends that, because of the delay, he lost the opportunity to serve his U.S. and Pakistani sentences concurrently. But Chaudhry has not provided any reason to suspect that he could have served his sentences concurrently. *See Lozano*, 962 F.3d at 781 ("Lozano's contention that the delay cost him the opportunity to serve a concurrent sentence . . . is unavailing, as the record doesn't show a credible possibility that he would have received a concurrent sentence . . . ."); *see also Uribe-Rios*, 558 F.3d at 358 ("[B]ecause there is no right to serve state and federal sentences concurrently, an appellant's lost chance of doing so cannot be used to establish prejudice for the purposes of challenging pre-indictment delay."). Beyond that, Chaudhry received a time-served sentence predicated, in part, on the fact that he had already served ten years in a Pakistani prison. Chaudhry has not been prejudiced by not receiving a concurrent custodial sentence in the United States and Pakistan when he served no custodial sentence in the United States.

Second, Chaudhry argues that he was forced to suffer inhumane prison conditions in Pakistan. Yet his suffering those prison conditions cannot be attributed to the United States and was not caused by the delay.[20] *See Grimmond*, 137 F.3d at 830 ("When, as here,

---

[20] Though Chaudhry does not specifically address the issue in his opening brief, the government argues in its response brief that Chaudhry cannot assert prejudice from the anxiety caused by the pending charges before he became aware of the charges in August 2020. In reply, Chaudhry retorts that he was prejudiced by the anxiety caused by speculating that charges might be brought against him in the United States. We agree with the government. We have previously held that a defendant who does not know about pending charges cannot argue he was prejudiced about anxiety suffered as a result of those charges. *See Lozano*, 962 F.3d at 781; *Lloyd*, 645 F. App'x at 278 n.5. Thus, even if Chaudhry had made this argument initially, it would not be a reason to determine he suffered actual prejudice.

a defendant is lawfully incarcerated for reasons not related to the pending charges and makes no credible showing that either his present or potential sentence will be substantially affected by the delay, we hold that there is simply no way the pretrial incarceration can be deemed oppressive." (citation omitted)); *United States v. Ghailani*, 733 F.3d 29, 50–51 (2d Cir. 2013) (finding the conditions of detention for a defendant detained by the CIA before trial were not relevant to his Sixth Amendment claim because he "would have been detained by the CIA for the purpose of obtaining information whether or not he was awaiting trial, and the conditions of his detention were a product of the CIA's investigation, not incarceration as a prelude to trial"); *see also United States v. Woodley*, 484 F. App'x 310, 319–20 (11th Cir. 2012) ("Woodley's conclusory assertions of unsanitary prison conditions and inability to access a law library, without more, are insufficient to establish actual prejudice.").

Third, Chaudhry argues that the delay impaired his ability to mount a defense because, during those ten years, one of his co-defendants, Yemer, suffered a severe mental breakdown and could no longer serve as a witness. It is true that the Supreme Court has stressed that impairments in a defendant's ability to assert a defense due to witness death or memory loss is a "serious" concern. *See Barker*, 407 U.S. at 532. But Chaudhry has not identified what Yemer would have testified on or even if that testimony would have been exculpatory. Without any additional information, Chaudhry's vague and speculatory assertions of harm are insufficient to demonstrate actual prejudice. *See United States v. Lewis*, 116 F.4th 1144, 1167 (10th Cir. 2024) ("Even where a defense witness has died, this court has still declined to find prejudice because the defendant could not 'state[] with

particularity . . . what exculpatory testimony would have been offered.'" (alterations in original) (quoting *United States v. Tranakos*, 911 F.2d 1422, 1429 (10th Cir. 1990))), *cert. denied*, 145 S. Ct. 1110 (2025); *United States v. Bass*, 460 F.3d 830, 838 (6th Cir. 2006) (finding that a defendant's assertions of prejudice were "vague and unsupported" when the defendant "d[id] not state what testimony any missing witnesses could have provided, which witnesses' memories were affected, or how his own memory problems affected his defense"); *United States v. Koller*, 956 F.2d 1408, 1414 (7th Cir. 1992) ("[The defendant's] general allegation that his witnesses' memories faded during the delay does not rise to the level of specificity required to show actual prejudice.").

Consequently, because we find that Chaudhry was neither presumptively nor actually prejudiced in this case, we affirm the district court's finding that the fourth *Barker* factor weighs against Chaudhry.

## III. CONCLUSION

In sum, the length of the delay weighs in favor of finding that Chaudhry's Sixth Amendment speedy trial rights were violated. Even so, because of the extent to which the remaining three *Barker* factors weigh against that finding, the judgment of the district court is,

*AFFIRMED.*